**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

LUIS O. ALOMAR-RODRÍGUEZ,

     Plaintiff,

       v.              CIVIL NO.: 12-1364 (MEL)

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

**OPINION AND ORDER**

I.    **PROCEDURAL HISTORY**

      Luis O. Alomar Rodríguez ("plaintiff" or "claimant") was born in 1965 and has completed some college. (Tr. 36, 102). Plaintiff has held various jobs over the fifteen years prior to his initial application for Social Security disability benefits, including gas station cashier, driver for a fast food restaurant, and a correctional officer. (Tr. 534). Plaintiff worked as a carpenter for a construction company for the longest period of time, approximately eight years. On November 14, 2008, plaintiff filed an application for Social Security disability benefits, alleging disability due to, *inter alia*, degenerative joint disease of the cervico-lumbar spine, obesity, asthma, and loss of vision in the left eye.[1] (Tr. 17–18, 533). The alleged onset date of the disability was October 4, 2007, while the end of the insurance period was March 31, 2009. (Tr. 17). Plaintiff's application was denied initially and upon reconsideration. (Tr. 15). Plaintiff made a timely request for a hearing before an Administrative Law Judge ("ALJ"). He testified at

---

[1] The aforementioned conditions were found by the Administrative Law Judge to be severe impairments for purposes of the disability determination. In his application, plaintiff also alleged a heart condition, carpal tunnel syndrome in the right hand, bursitis, a right leg injury due to a work accident, depression, and anxiety as causes for disability. (See Tr. 18). Nevertheless, these conditions were not determined to be severe impairments. (Tr. 17–19). These particular determinations do not appear to be contested by plaintiff in his memorandum. (D.E. 14). Plaintiff also alleged disability due to migraines, and now contends that the Administrative Law Judge did not adequately consider his allegations of pain. Id. at 14.

a hearing held on May 27, 2010, and was represented by counsel.  (Tr. 31–80).  A medical expert and a vocational expert provided testimony at the hearing.  The ALJ rendered a decision on July 16, 2010, denying plaintiff's claim.  (Tr. 25).  The Appeals Council denied plaintiff's request for review on April 9, 2012.  (Tr. 1).  Therefore, the ALJ's opinion became the final decision of the Commissioner of Social Security (the "Commissioner" or "defendant").

On May 21, 2012, plaintiff filed a complaint seeking review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), alleging that it was "contrary to the law, to the facts and to the evidence of this case."  (D.E. 2, ¶ 5).  On July 26, 2012, defendant filed an answer to the complaint and a certified transcript of the administrative record.  (D.E. 12; 13).  Both parties have filed supporting memoranda.  (D.E. 14; 15).  For the reasons set forth below, the Commissioner's decision is affirmed.

## II.   LEGAL STANDARD

### A.   Standard of Review

Once the Commissioner has rendered his final determination on an application for disability benefits, a district court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing [that decision], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The court's review is limited to determining whether the ALJ employed the proper legal standards and whether his factual findings were founded upon sufficient evidence.  Specifically, the court "must examine the record and uphold a final decision of the Commissioner denying benefits, unless the decision is based on a faulty legal thesis or factual error."  López-Vargas v. Comm'r of Soc. Sec., 518 F. Supp. 2d 333, 335 (D.P.R. 2007) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)).

Additionally, "[t]he findings of the Commissioner … as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The standard requires "'more than a mere scintilla of evidence but may be somewhat less than a preponderance' of the evidence."  Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

While the Commissioner's fact findings are conclusive when they are supported by substantial evidence, they are "not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citing Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam); Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)).  Moreover, a determination of substantiality must be made based on the record as a whole.  See Irlanda Ortiz, 955 F.2d at 769 (citing Rodríguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  However, "[i]t is the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence."  Id.  Therefore, the court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Rodríguez Pagán v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

## B.      Disability under the Social Security Act

To establish entitlement to disability benefits, the claimant bears the burden of proving that he or she is disabled within the meaning of the Social Security Act.  See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 146–47 (1987).  An individual is deemed to be disabled under the Social Security Act if he or she is unable "to engage in any substantial gainful activity by reason of any

3

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Claims for disability benefits are evaluated according a five-step sequential process. 20 C.F.R. § 404.1520; Barnhart v. Thomas, 540 U.S. 20, 24–25 (2003); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999); Yuckert, 482 U.S. at 140–42. If it is determined that the claimant is not disabled at any step in the evaluation process, then the analysis will not proceed to the next step. At step one, it is determined whether the claimant is working and thus engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, then disability benefits are denied. 20 C.F.R. § 404.1520(b). Step two requires the ALJ to determine whether the claimant has "a severe medically determinable physical or mental impairment" or severe combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If he does, then the ALJ determines at step three whether the claimant's impairment or impairments are equivalent to one of the impairments listed in 20 C.F.R. part 404, subpart P, appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). If so, then the claimant is conclusively found to be disabled. 20 C.F.R. § 404.1520(d). If not, then the ALJ at step four assesses whether the claimant's impairment or impairments prevent him from doing the type of work he or she has done in the past. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ concludes that the claimant's impairment or impairments do prevent him from performing her past relevant work, the analysis then proceeds to step five. At this final step, the ALJ evaluates whether the claimant's residual functional capacity ("RFC"),[2] combined with his age, education, and work experience, allows him to perform any other work that is available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines that there is work in the

---

[2] An individual's residual functional capacity is the most that he or she can do in a work setting despite the limitations imposed by her mental and physical impairments. 20 C.F.R. § 404.1545(a)(1).

national economy that the claimant can perform, then disability benefits are denied. 20 C.F.R. §
404.1520(g).

Under steps one through four, the plaintiff has the burden of proving that he cannot return
to his former job because of his impairment or combination of impairments. Ortiz v. Sec'y of
Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989) (per curiam). Once he has carried
that burden, the Commissioner then has the burden under step five "to prove the existence of
other jobs in the national economy that the plaintiff can perform." Id.

## III.   RELEVANT MEDICAL EVIDENCE

### A.   Medical Record

Before plaintiff's alleged onset date of October 4, 2007,[3] he had been admitted twice—on
September 27, 2004, and October 3, 2005—to the State Insurance Fund ("SIF") Industrial
Hospital ("SIF Hospital") due to work-related lower back pain. (Tr. 353, 383). On October 4,
2007, plaintiff, in his employment as a carpenter, injured his lower back while lifting a wood
panel and was admitted to the SIF Hospital. (Tr. 170, 194). Plaintiff was diagnosed with "acute
low back pain" and "R/O D/L sprain." (Tr. 333).

On October 11, 2007, plaintiff received magnetic resonance imaging ("MRI") scans of
the lumbar spine and cervical spine. (Tr. 283). The radiologist noted that early discogenic disc
disease changes were seen at the L3-L4, L4-L5, and L5-S1 levels, with a small central disc
protrusion at L4-L5, but no central spinal canal stenosis or narrowing of the neural foramina.
The MRI scan of the cervical spine shows a small central disc protrusion at the C6-C7 level
producing a mild impression upon the thecal sac. The radiologist also noted "[u]ncovertebral

---

[3] Evidence outside of the disability insurance period is ordinarily irrelevant but for those instances in which it can
shed some light on claimant's conditions during said period of time. Cf. Padilla Pérez v. Sec'y of Health & Human
Servs., 985 F.2d 552, 1993 WL 21064, at *5 (1st Cir. 1993) (unpublished) ("Medical evidence generated after a
claimant's insured status expires may be considered for what light (if any) it sheds on the question whether
claimant's impairment reached disabling severity *before* his insured status expired." (emphasis in original)).

joints degenerative changes" at the C4-C5 and C5-C6 levels producing mild narrowing of the neural foramina.  Id.

Plaintiff was discharged from the SIF Hospital on October 15, 2007.  (Tr. 311).  He was diagnosed with lumbar radiculitis and L4-L5 and C5-C6 disc protrusions.  (Tr. 170).  The discharge document also notes that plaintiff was unrelatedly experiencing anemia, asthma, and headaches.  Plaintiff was referred to a medical inspector for conditions relating to the work injury and a private doctor for the unrelated conditions.  He was also referred for acupuncture treatment.

Between November 5, 2007, and September 8, 2008, plaintiff frequently received treatment under the auspices of the SIF.  (Tr. 635–41, 644–70, 780–852).  SIF progress notes from this period typically indicate that plaintiff had lumbar radiculitis; L4-L5 and C5-C6 disc protrusions; cervical, dorsal, and lumbosacral sprains; anemia; asthma; and headaches.  (See, e.g., 146, 149, 180, 182, 184).  On November 5, 2007, plaintiff visited an SIF clinic seeking pain medication, stating that he had moderate pain.  (Tr. 148, 193).  According to the clinic's screening document, plaintiff arrived at the location without difficulty.  Plaintiff was prescribed Lodine XL, Zantac, Ultracet, and Neuractin.

A progress note dated November 15, 2007, from Dr. M. Adorno Rivera ("Dr. Adorno"), an SIF physician, indicates that plaintiff was experiencing cervical and lumbosacral spasms and decreased range of motion.  (Tr. 146).  Dr. Adorno recommended physical therapy.  Plaintiff's electromyography examination of the lower extremities conducted on December 11, 2007, was described as normal.  (Tr. 152–53).  On the same day, a physiatrist prescribed various physical therapy exercises.  (Tr. 177–78).  On December 18, 2007, plaintiff was prescribed a single-point

cane by a physical therapist "in order to assist in his walking and rehabilitation process."  (Tr. 191, 666).

In his visit with Dr. Adorno on January 10, 2008, plaintiff reported severe neck pain.  (Tr. 155).  Plaintiff had finished physical therapy, but showed no improvement.  Dr. Adorno referred plaintiff to a neurosurgeon, noting that, aside from bilateral carpal tunnel syndrome, plaintiff's electromyography and nerve conduction velocity tests were normal.  (Tr. 155, 192).   On February 11, 2008, Dr. Adorno noted again that plaintiff was experiencing cervical and lumbosacral spasms.  (Tr. 180).   Dr. Adorno was also still waiting for an evaluation by a neurosurgeon.

Between February 7, 2008, and November 23, 2009, plaintiff had at least sixteen visits to a health facility run by the Autonomous Municipality of Guaynabo ("Guaynabo facility").  (Tr. 199–202).  Nine of the visits were at least in part due to plaintiff's foot pain, but only the first three occurred before the expiration of plaintiff's insurance period.  (Tr. 210, 215, 225, 244, 252, 256, 260, 264, 276).  After reporting that his foot pain was at a level of nine out of ten on June 30, 2008, plaintiff received kenalog and lidocaine injections.  (Tr. 726–27).  The operative report from January 30, 2009, noted plaintiff's history of discogenic disease.  (Tr. 235).  Plaintiff had been taking Norflex and Lodine.  At the Guaynabo facility, plaintiff was also treated for asthma, lower back pain, and obesity.  (Tr. 201–02).

On March 5, 2008, plaintiff reported severe neck pain with movement limitation during another visit with Dr. Adorno.  (Tr. 182).   Again, Dr. Adorno noted that plaintiff was experiencing cervical and lumbosacral spasms and requested an expedited appointment with a neurosurgeon.  On an undated visit between May 8 and June 3, 2008, Dr. Adorno observed

plaintiff walking with a cane and administered Toradol and Norflex for cervical and lumbosacral pain. (Tr. 187–90).

Plaintiff was admitted to the SIF Hospital between July 22 and 24, 2008, due to back pain. (Tr. 305). On July 23, 2008, Dr. C. Zapata ("Dr. Zapata"), a neurosurgeon, recommended conservative management and cervical collar support. (Tr. 162). The discharging physician recommended bed rest and referred plaintiff to a medical inspector. (Tr. 307). On July 30, 2008, plaintiff visited a physiatrist at the SIF Hospital for physical medicine and rehabilitation. (Tr. 157–58). The physiatrist gave a guarded prognosis.

An SIF progress note from September 8, 2008, indicates that plaintiff reported difficulties with walking and was experiencing cervical and lumbrosacral spasms. (Tr. 183). The progress note also states that Dr. Zapata recommended conservative treatment, rather than surgery or treatment with a neurosurgeon. Plaintiff was "[d]ischarge[d] with disability."[4] Id.

Dr. Oscar J. Benítez ("Dr. Benítez"), a consulting neurologist, evaluated plaintiff on January 28, 2009, for his complaints of cervical, lumbar, right arm, and leg pain. (Tr. 672–79). Plaintiff had been taking Lodine, Norflex, Ultracet, Neurin, and Albuterol.   (Tr. 673). Dr. Benítez noted plaintiff's history of bronchial asthma and blindness in the left eye, and the physical examination revealed right corneal opacity. (Tr. 673–74). Plaintiff reported that his back pain would worsen four to five hours after sitting or bending and that he was unable to lift objects from the floor. (Tr. 673). Plaintiff was able to complete the straight leg raising test to 70 and 30 degrees for his left and right legs, respectively, and to 90 degrees bilaterally while sitting.

---

[4] Conclusions as to whether a claimant is "disabled" and related legal conclusions are administrative decisions that are to be made by the Commissioner, not by medical personnel. 20 C.F.R. § 404.1527(e); see Rivera v. Comm'r of Soc. Sec., Civ. No. 08-2281 (JAF), 2010 WL 132329, at *5 (D.P.R. Jan. 8, 2010) ("[W]hile [his physician] believed that [c]laimant was disabled and unable to work, disability under the Act is a legal determination that is reserved to the ALJ, and medical experts are not qualified to render this ultimate legal conclusion." (internal citation omitted) (citing Frank v. Banhart, 326 F.3d 618, 620 (5th Cir. 2003))).

(Tr. 674).  Plaintiff's reflexes were "symmetric +2," and his upper and lower extremities were normoactive.  Id.  Dr. Benítez noted no sensory deficits, cervical or lumbar spasms, atrophy, or diminished strength.  (Tr. 674, 676).  Dr. Benítez's gait report indicates that plaintiff used a cane, but without the cane he could walk with a slow but otherwise normal gait.  Plaintiff could walk on his heels and toes, and dress and undress on his own.  (Tr. 674).  According to x-rays ordered by Dr. Benítez, there were mild degenerative changes but no acute pathology in plaintiff's lumbosacral spine, whereas plaintiff's chest and right hand appeared normal.   (Tr. 672).  Dr. Benítez determined that plaintiff had chronic cervical and lumbar pain and a reserved prognosis.  (Tr. 674).  Nonetheless, there was "no objective evidence of neurological deficit" and plaintiff was "able to sit, stand, walk, carry, lift and handle objects, hear, speak and travel."  Id.

On March 11, 2009, a chest x-ray and an electrocardiogram were conducted.  (Tr. 680–83).  The interpreting doctor observed that the aorta was elongated and there was mild thoracic spondylosis, but otherwise the results were normal.  Dr. Vicente Sánchez, a state agency medical expert, reviewed plaintiff's medical evidence and determined on April 24, 2009, that plaintiff had a severe medically determinable impairment.   (Tr. 684–85).   On May 20, 2009, Dr. Benjamin Cortijo ("Dr. Cortijo"), another state agency medical expert, reviewed plaintiff's medical evidence, and determined that he could lift or carry twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for six to eight hours; and stoop and climb occasionally. (Tr. 642–43).  Dr. Cortijo also concluded that plaintiff had no manipulative limitations.

Dr. Lorena Díaz-Trancon ("Dr. Díaz-Trancon"), a state agency medical expert, completed a physical RFC assessment and a case analysis on November 20, 2009.  (Tr. 689–97).  Dr. Díaz-Trancon determined that plaintiff could lift or carry twenty pounds occasionally and ten

pounds frequently; stand, walk, or sit for six hours; frequently balance, kneel, crawl, or climb ramps or stairs; and occasionally stoop, crouch, or climb ladders, ropes, or scaffolds.

### B.      Administrative Hearing

At the hearing held on May 27, 2010, plaintiff testified that he felt a "severe" and "constant pain" in his "upper back, … lower back and both legs," which caused him to be "always in a bad mood." (Tr. 43–44, 58). He stated that, before beginning to use crutches two weeks earlier, he had been using a cane prescribed by a SIF doctor, and that, without the crutches or cane, he could walk with difficulty. (Tr. 45–46, 49). He also testified that he was only able to stand for an hour before his feet would hurt, sit for two hours, and walk for 200 to 300 steps. (Tr. 45). Plaintiff stated that he could use his hands, fingers, and arms; that he could lift his right arm only to shoulder height; and that his bursitis in his right shoulder and carpal tunnel syndrome in his right hand caused him "discomfort," but not "extreme pain." (Tr. 48, 53–54). Plaintiff also informed the ALJ that he had vision loss in his left eye since childhood. (Tr. 52). With respect to his asthma, plaintiff testified that he used a pump every four hours and a therapy machine every half hour. (Tr. 66). Plaintiff testified that he would wake up with a headache every two days, lasting for half a day, but that medication helped. (Tr. 66–67). Side effects from his depression medications have included headaches, nausea, and loss of appetite. (Tr. 59). Plaintiff also testified about his treatment at the SIF and the Guaynabo facility. (Tr. 48–51).[5]

Dr. Germán E. Malaret ("Dr. Malaret"), a medical expert, also testified at the hearing. (Tr. 69–73, 472–94). Dr. Malaret testified that the primary condition was plaintiff's degenerative lumbar and cervical disc disease. (Tr. 70). He indicated that plaintiff could lift

---

[5] In addition, plaintiff testified that he had been using a neck collar for approximately one year, (Tr. 47–48), but that would have been after the expiration of the insurance period. At the hearing, plaintiff also discussed his psychiatric treatment with the SIF and emotional condition, (Tr. 54–57), but he has not contested in his memorandum the ALJ's determination that he did not have a severe mental impairment.

only twenty pounds and carry ten pounds.  (Tr. 71).  Dr. Malaret stated that, although plaintiff

testified that he used a cane and could only walk 200 to 300 steps and sit or stand for one hour,

there was no "indication in the file for the use of a cane."  (Tr. 71–72).  He pointed out that the

electrocardiogram and the study of nervous conduction from December 2007 were "normal."

(Tr. 72).   Plaintiff, however, had "environmental limitations such as a sensitivity to strong

smells, aromas, dust, [and] extreme heat or cold" due to his asthma.  (Tr. 73).

Carmen Margarita Valladares ("Valladares") testified at the hearing as a vocational

expert.  (Tr. 74–80, 495–98).  For a hypothetical involving light to moderate pain, but with an

adequate response to medication, Valladares testified that plaintiff could perform his previous

work as "Cashier I," "Outside Deliverer," and "Correctional Officer."[6]  (Tr. 78).  If, however, the

pain was considered to be "severe" and "constant," affecting "concentration, attention and

rhythm of work," Valladares concluded that plaintiff could not perform his past work.  (Tr. 76–

77).  When the hypothetical included an "emotional condition" which made plaintiff "irritable,"

making it difficult for him to relate to co-workers and supervisors, Valladares testified again that

plaintiff would not be able to return to any of his past work, nor could she identify any other job

for plaintiff in the national economy.  (Tr. 78).

## IV.   ANALYSIS

Here, the ALJ ended his analysis at step four of the disability determination, concluding

that plaintiff was not prevented from doing the type of work he had done in the past.[7]  In making

---

[6] The hypothetical also included the following limitations: light work, monocular vision, asthma, and environmental restrictions (no concentration of gases, smoke, particles, emissions, volatile substances, or extreme temperatures or humidity).  (Tr. 76–78).  Therefore, plaintiff's RFC and the hypothetical presented to the vocational expert incorporated both plaintiff's asthma and vision loss.  Moreover, plaintiff testified that he had vision loss in his left eye since childhood and, thus, before the alleged disability onset date.  (Tr. 52).

[7] With respect to plaintiff's RFC, the ALJ determined that "the claimant had the residual functional capacity to perform light work … except that such retained residual functional capacity is limited to less than the full range of light work, due to additional non-exertional limitations stemming from visual limitations and asthma."  (Tr. 20).  In

this determination, the ALJ relied on Valladares's testimony that plaintiff could perform prior jobs involving light work such as cashier and outside deliverer.[8]

In his memorandum, plaintiff argues that the ALJ failed to consider adequately his complaints of pain.  (D.E. 14, at 14).  Citing Simonson v. Schweiker, 699 F.2d 426 (8th Cir. 1983) in support, plaintiff contends that "the Commissioner has failed" to treat him "as [a] real individual[] with unique reactions to physical trauma," by "disregard[ing his] subjective complaints of pain solely because there exists no objective evidence in support of such complaints." Id.

As an initial matter, the ALJ specifically recognized that "the absence of objective findings alone cannot be used against the claimant, nor can it be used as the sole means for determining that the claimant does not have an alleged condition." (Tr. 22).  Rather, the absence of objective support for plaintiff's subjective complaints was used by the ALJ as "an indication of credibility." (Tr. 23).  The ALJ pointed out that plaintiff had no gait disturbance and that he stated at the hearing that he had no problems using his hands, which Dr. Malaret also noted. (Tr. 22, 48, 53–54, 70, 674, 676).  As the ALJ observed, it appeared that plaintiff had responded adequately to treatment on the whole, because his treatment remained conservative and surgery had not been recommended. (Tr. 22).

Furthermore, Dr. Benítez detected no neurological deficits, sensory disturbances, or muscle atrophy. (Tr. 674, 676).  The opinion of Dr. Benítez was accorded "substantial weight" by the ALJ because he is a neurological specialist. (Tr. 22).  Although plaintiff was taking Panadol for his headaches, the ALJ observed that it is a readily available over-the-counter

---

particular, plaintiff would be precluded from "engaging in tasks requiring binocular vision" and had environmental restrictions of "extreme cold, extreme heat, wetness, fumes gases and humidity." Id.

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  A job involving light work "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." Id.

medication, used by many to relieve "mild to no more than moderate pain." Id.; (see also Tr. 67). The ALJ noted that there was no evidence that plaintiff's migraines resulted in hospitalization or the prescription of stronger medications. Id. The ALJ reduced the credibility afforded to plaintiff's allegations of side effects from medications because there was no evidence that he conveyed his complaints to treating or consulting sources or that attempts were made to change the type, dosage, or frequency of the offending medications. (Tr. 22–23).

Moreover, when plaintiff visited the SIF clinic, he indicated that he had moderate pain and arrived without difficulty. (Tr. 148, 193). When referring plaintiff to a neurosurgeon, Dr. Adorno noted that, aside from bilateral carpel tunnel syndrome, his electromyography and nerve conduction velocity tests were normal. (Tr. 155, 192). On July 23 and September 8, 2008, Dr. Zapata recommended conservative treatment rather than surgery. (Tr. 162, 183). Dr. Benítez noted plaintiff had no sensory deficits, cervical or lumbar spasms, atrophy, or diminished strength. (Tr. 674, 676).

The ALJ even clarified that the credibility determination was not "intended to imply that [plaintiff] has no pain or other subjective complaints." (Tr. 23). Rather, the ALJ concluded that the "allegations of subjective complaints [we]re credible only to the extent that strenuous activities, such as engaging in heavy and medium exertion, could produce such symptoms." Id.

Unlike the ALJ in Simonson, it is clear that the ALJ in the instant case has "give[n] serious consideration to evidence of [plaintiff]'s pain and [did not] disregard subjective reports of pain *solely* because they [we]re not fully corroborated by objective medical evidence." 699 F.2d at 430 (emphasis added). Although in this case "[t]he absence of major objective medical findings to support allegations of disabling pain and other symptoms" was used as "one factor … to evaluate credibility," (Tr. 23), the ALJ did not impermissibly "disbelieve [plaintiff]'s

subjective reports of pain … solely because [he could not] show the exact physiological source of his pain," Simonson, 699 F.2d at 429.  As such, plaintiff has failed to show that the ALJ's determination concerning his subjective allegations was unsupported by substantial evidence.

Plaintiff also alleges that the ALJ failed to incorporate into the hypothetical presented to Valladares his use of a cane.  (D.E. 14, at 15–17).  It is true that "in order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." Arocho v. Sec'y of Health & Human Services, 670 F.2d 374, 375 (1st Cir. 1982).  Nevertheless, "'the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible.'"  Simila v. Astrue, 573 F.3d 503, 521 (7th Cir. 2009) (quoting Schmidt v. Astrue, 496 F.3d 833, 846 (7th Cir. 2007)).  Thus, for the hypothetical question to be erroneous, the ALJ's determination that plaintiff's use of a cane was not a limitation must be unsupported by substantial evidence.

Plaintiff claims that Dr. Malaret's statement that there was no "indication in the file for the use of a cane," (Tr. 72), was erroneous, because plaintiff had been prescribed a cane to assist him in walking by an SIF physical therapist, (Tr. 45, 191), he in fact walked with one, (Tr. 45), and Dr. Benítez's report indicated that plaintiff's gait was slow without it, (Tr. 676).  These arguments, however, are not inconsistent with the ALJ's analysis.  The ALJ concluded that, although "it may well have been that a walking cane was prescribed," Dr. Benítez observed that "the claimant can walk without the cane."  (Tr. 22, 674, 676).  Specifically, Dr. Benítez determined that, without a cane, plaintiff had a slow but otherwise normal gait.  (Tr. 674).  Moreover, plaintiff was "able to walk on heels and toes."  Id.  The cane served merely "as an aide to ambulation."  (Tr. 19).  Similarly, both Dr. Cortijo and Dr. Díaz-Trancon determined that

plaintiff could stand or walk for at least six hours in a workday, supporting the ALJ's finding that plaintiff had the RFC for light work.  (Tr. 643, 690).  Upon considering the totality of the evidence, the ALJ determined that, even if plaintiff was prescribed a cane, it was not necessary for walking and its absence would not be an additional impairment for plaintiff.  Because there was substantial evidence to support this conclusion, the hypothetical submitted to Valladares was not erroneous.

Finally, plaintiff asserts that "the Administrative Law Judge cited only the evidence favorable to the Commissioner, to the disregard of the overwhelming evidence to the contrary." (D.E. 14, at 17).  Plaintiff provides no specific example of evidence which was not discussed by the ALJ.  To the contrary, the ALJ expressly considered, for example, clinical findings in the progress notes from the SIF-affiliated physicians, the SIF Hospital, and the Guaynabo facility, including diagnoses of lumbar radiculitis, disc protrusions, bursitis, carpal tunnel syndrome, myalgias, foot pain, and early calcaneal spur, (Tr. 19); plaintiff's subjective complaints of pain, (Tr. 19, 22); and "the claimant's medical history of several accidents and injuries to the back and of the claimant's vision loss in the left eye," (Tr. 21).  It is not readily apparent what "overwhelming evidence" in particular the ALJ chose to disregard.  As such, plaintiff has not established that any of the ALJ's determinations were not based on substantial evidence.

V.    CONCLUSION

Based on the foregoing analysis, the Court concludes that the decision of the Commissioner was based on substantial evidence.  Therefore, the Commissioner's decision is hereby **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of April, 2013.

s/Marcos E. López<br>
U.S. Magistrate Judge
